UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

RONALD E. PECK,                          )
                                         )
    Plaintiff,                           )
                                         )
        v.                               )   Civil Case No. 13-00073 (RJL)
                                         )
SELEX SYSTEMS INTEGRATION, INC.          )
*et al.*,                                )
                                         )
    Defendants.                          )

## MEMORANDUM OPINION

(September 8th, 2017) [Dkts. ## 65, 66, 67]

Ronald Peck ("plaintiff" or "Peck") has sued SELEX Systems Integration, Inc. ("Selex") and SELEX Sistemi Integrati, Inc. Key Employee Deferred Compensation Plan (the "Plan") for benefits and compensation that he alleges he accrued during his employment as an executive for Selex. Counts I and III allege state law breach of contract claims seeking severance pay and relocation expenses, whereas Count II seeks deferred compensation benefits from the Plan under the Employee Retirement Income Security Act ("ERISA"). Am. Compl. [Dkt. # 33]. In March 2016, I granted summary judgment to the defendants on Count II of the Amended Complaint. *See* 03/24/16 Mem. Op. and Order [Dkts. ## 52, 53].

In June 2017, I held a bench trial and heard oral arguments on Counts I and III of the Amended Complaint. After the trial, the parties presented proposed findings of facts and conclusions of law on Counts I and III. [Dkts. # 66, 67] In July, plaintiff moved the

Court to reconsider its March 2016 decision granting summary judgment to the defendants on Count II. [Dkt. # 65] Upon careful consideration of the record, the proposed findings of fact, and the plaintiff's motion to reconsider, I find that Mr. Peck is not entitled to severance pay under the terms of his at-will employment agreement, but is entitled to the closing costs from the sale of his home under the relocation agreement he entered with Selex. As a result, I will enter judgment for Selex on Count I and judgment for plaintiff on Count III. In addition, I find that plaintiff has not met the burden of showing that justice requires me to reconsider my earlier judgment for defendants on Count II and will therefore DENY his Motion for Reconsideration of Count II.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Defendant Selex is a company based in Overland Park, Kansas, that manufactures aviation navigation, landing, and surveillance systems. 03/24/16 Mem. Op. at 2; 06/02/17 Trial Tr. at 43:15-25 [Dkt. # 62]. Plaintiff Ronald Peck is an engineer who worked for Selex in both its Kansas and Washington, D.C. offices from 1997 until 2012. 03/24/16 Mem. Op. at 2; 06/01/17 Trial Tr. at 64:13-17, 94:21-95:5 [Dkt. # 61]. In September 2012, Selex terminated Peck, Selex's then-Vice President of Business Development, after he declined to return to the Overland Park, Kansas office to serve as the Vice President of Quality Control and Business Improvement. Pl.'s Trial Ex. 18, 10/01/12 Letter from Selex to Peck ("Termination Letter").

After his termination, Peck sued Selex for benefits he alleges he accrued during his employment. In the operative Amended Complaint he filed in this Court, Peck seeks:

(1) nine months of severance pay totaling $151,549 he claims he was entitled to under the company's severance policy; (2) $57,020 in deferred compensation he claims he accrued under the company's "top hat" deferred compensation plan, and to which he claims he is entitled under ERISA; and (3) a sales commission of $25,195 paid on the sale of his Overland Park, Kansas home. As mentioned above, I already granted summary judgment to defendants on Peck's claim for deferred compensation under ERISA, on the grounds that the committee tasked with administering the deferred compensation plan reasonably construed the plan's terms when it determined that he had been terminated for cause. *See* 03/24/16 Mem. Op. at 9-12.

On June 1 and 2, I held a bench trial where I heard evidence and testimony from the parties on Counts I and III of the Amended Complaint. In addition to Mr. Peck himself, I heard witness testimony from Gary Stevens, Selex Chief Financial Officer, and Mike Warner, Selex Chief Executive Officer at the time of Peck's termination. I heard closing arguments on June 5 and received proposed findings of fact and conclusions of law on July 11. On July 11, the plaintiff also submitted his motion to reconsider Count II of the Amended Complaint.

## II. FINDINGS OF FACT

After carefully considering the record and the parties' proposed findings of fact, I find that the following facts have been established by a preponderance of the evidence.

SELEX Systems Integration, Inc. is a company with headquarters in Overland Park, Kansas, that manufactures aviation navigation, landing, and surveillance systems.

06/02/17 Trial Tr. at 43:15-25, 44:18-20. Plaintiff Peck worked at Selex from April 1997 until September 2012. 06/01/17 Trial Tr. at 65:7-8, 85:14-20.

In March 2008, Peck became Selex's Vice President of Business Development, where he was responsible for Selex's efforts to expand its market in the United States. *Id.* at 65:20-23, 66:22-67:3. As part of those efforts, Selex opened a Washington, D.C. office in August 2010 to ensure that Selex employees would be closer to the Federal Aviation Administration and other potential clients in the U.S. market. *Id.* at 67:6-17, 68:1-2. At that time, Peck formally transferred his work to the Washington, D.C. office from the Kansas office. Pl.'s Trial Ex. 11, Peck Change of Status Form. From August 2010 until October 2011, Peck commuted from Kansas to the Washington office on a weekly basis. 06/01/17 Trial Tr. at 96:22-97:8.

### A. February 2012 Relocation Agreement

In October 2011, Peck and his wife moved to the Washington, D.C. area, and they signed a lease for an Alexandria townhome in December 2011. *Id.* at 97:19-98:18; Defs.' Trial Ex. 14, Peck Lease.

On February 29, 2012, Peck entered into a formal relocation agreement with Selex, with an effective date of February 6, in which Selex agreed to compensate Peck for specific costs that he had incurred in his move from Overland Park to Washington, D.C. Pl.'s Trial Ex. 3, 02/06/12 Relocation Agreement ("Relocation Agreement"). In the letter, Selex specifically agreed: (1) to pay a cost of living salary increase of 37%; (2) to "pay a maximum $6,900.00 for moving [Peck's] household goods"; (3) to "pay costs associated with the sale of [Peck's] primary residence in Overland Park"; (4) to "reimburse final travel

4

expenses to [Peck's] new location"; and (5) to "pay closing costs on the purchase of [Peck's] primary residence in Virginia." *Id.* at 1. However, the agreement stated that, "[a]s a condition to receiving relocation benefits, you must remain employed by SELEX for at least two (2) years." *Id.* at 2. The agreement further stated that if Peck voluntarily left Selex within one year of relocation, he would have to repay 100% of all relocation expenses, and if he left between the first and second year, he would have to repay 50% of all relocation expenses. *Id.*

In June 2012, Peck and his wife placed their Kansas home on the market; they entered into an agreement to sell the house in July 2012, and closed the sale on September 28, 2012. Pl.'s Trial Ex. 19, July 2012 Real Estate Contract; 06/01/17 Trial Tr. at 103:3-4. Peck paid $25,195 as a broker commission for the sale of the residence. Pl.'s Trial Ex. 25, 09/28/12 Settlement Statement at 2.

**B.  Mr. Peck's Termination from Selex**

During his tenure as Vice President of Business Development, Peck was supervised by then-Selex CEO Mike Warner ("Warner"). 06/02/17 Trial Tr. at 41:23-25, 43:9-10. On August 20, 2012, Warner spoke with Peck by phone and expressed dissatisfaction with Peck's performance in his business development role. 06/01/17 Trial Tr. at 75:11-23; 06/02/17 Trial Tr. at 92:10-93:2. At a follow-up meeting on August 23, Warner asked Peck to consider returning to Kansas to serve as Selex's Vice President of Quality Control and Business Improvement. 06/01/17 Trial Tr. at 79:10-23; 06/02/17 Trial Tr. at 94:24-96:18. On August 29, 2012, Warner sent Peck a letter stating that "SELEX can no longer support your continuation in Washington, DC in a senior marketing capacity." Pl.'s Trial

5

Ex. 14, 08/29/12 Letter from Selex to Peck. The letter further stated that Peck needed to "transfer immediately back to Overland Park to assume the position of Vice President [of] Quality Control and Business Improvement." *Id.* On September 3, 2012, Peck replied to Warner and formally declined to assume the new position in Overland Park. Pl.'s Trial Ex. 15, 09/03/12 Letter from Peck to Selex. Peck stated that he was not voluntarily terminating his employment and was instead willing to continue in his D.C. marketing role. *Id.* Warner responded soon thereafter in another letter which expressed to Peck that it would consider his failure to assume the quality control position "a deliberate and intentional refusal to perform the material duties and obligations of your employment" and "would constitute 'cause'" for termination. Pl.'s Trial Ex. 16, 09/14/12 Letter from Selex to Peck at 1-2. On October 1, 2012, Warner sent a final letter to Peck stating that he had been terminated for cause and was not eligible for severance or payment under the deferred compensation plan. *See* Termination Letter.

At the time of Peck's termination, Selex's 2012 Employee Handbook stated that Selex would provide "separation benefits" to eligible full-time employees "whose employment terminates due to lack of work, elimination of position, or change of control." Pl.'s Trial Ex. 2, Selex 2012 Employee Handbook at 51 ("Employee Handbook"). The handbook further stated that employees are not eligible for severance pay when (1) the "employee voluntarily terminates employment"; (2) the Company "terminates employment for Cause"; or (3) the Company "terminates employment due to retirement or death." *Id.* Selex also had a distinct written separation policy for executives and department managers, which stated that department managers with more than ten years of service at the company

6

would be entitled to nine months of severance pay. Pl.'s Trial Ex. 1, Selex Executive and Department Management Separation Policy ("Separation Policy"). Although the employee handbook and the separation policy were separate documents, they were intended to be read in conjunction with one another. 06/02/17 Trial Tr. at 71:19-72:7.

The evidence provided by Selex CFO Gary Stevens indicates that after Peck's termination, his business development responsibilities were temporarily assumed by Warner and two consultants who were paid more for their additional responsibilities. *Id.* at 21:23-22:8. The business development position remained in Selex's budget throughout 2013 and 2014, and was filled in 2014 by Tony Cortese, who has since been replaced by Radzi Buckman. *Id.* at 22:21-23:16.

### III. CONCLUSIONS OF LAW

**A. Count I of the Amended Complaint–Contract Claim for Severance Pay**

When sitting in diversity jurisdiction, the Court applies the substantive law of the forum in which it sits—specifically, the District of Columbia. *Metz v. BAE Sys. Solutions & Servs., Inc.*, 744 F.3d 18, 21 (D.C. Cir. 2014) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938)). Because choice-of-law principles are substantive law, the Court must also apply the District's choice-of-law rules. *Wu v. Stomber*, 750 F.3d 944, 949 (D.C. Cir. 2014). When a disputed contract fails to include a choice-of-law provision, D.C. courts perform a "governmental interest" analysis to decide which jurisdiction's law controls the contract. *Adolph Coors Co. v. Truck Ins. Exch.*, 960 A.2d 617, 620 (D.C. 2008). Under the "governmental interest" analysis, the Court considers the following factors: "(1) the

7

place of contracting; (2) the place of negotiation of the contract; (3) the place of performance; (4) the location of the subject matter of the contract; (5) the residence and place of business of the parties; and (6) the principal location of the insured risk." *Id.* Courts applying this governmental interest analysis in the context of an employment agreement have also emphasized the location where the employee at issue performed his or her job responsibilities. *See Rafferty v. NYNEX Corp.*, 60 F.3d 844, 850 (D.C. Cir. 1995) ("Recognizing that NYNEX's principal place of business is New York and that Telco was incorporated and is headquartered in Tennessee, we nonetheless conclude that the District of Columbia has the greatest interest in resolving Rafferty's claims because he worked at Telco's District of Columbia consulting division at the time he was discharged.").

Applying those factors to the facts of this case, the Court determines that D.C. law should apply to govern Peck's contract claims. The six factors are somewhat difficult to apply directly, given that under plaintiff's theory, the purported contract is not a single negotiated instrument, but rather an enforceable right to accrued benefits under his "at-will" employment agreement with Selex. However, considering all the factors together, it is clear that D.C. has the strongest interest in applying its laws to this dispute. Kansas admittedly has legitimate interests in applying its own law to the dispute—Selex is a Kansas-based company and Peck now resides again in Kansas. However, Peck's work as Vice President of Business Development in the District of Columbia was both the subject and performance of the contract, and his termination occurred while he was residing in D.C. As a result, the District (in my judgment) has the greater interest in applying its own law governing employment contracts.

To demonstrate entitlement to severance pay, Peck first must show that a severance pay agreement existed. Under D.C. law, an at-will employee has an enforceable agreement with his employer that entitles him "to monetary compensation for benefits accrued under those terms." *Kauffman v. Int'l Bhd. Teamsters*, 950 A.2d 44, 49 (D.C. 2008) (citing *Nat'l Rifle Ass'n v. Ailes*, 428 A.2d 816, 820 (D.C. 1981)). An at-will employment "agreement" is different from a traditional employment contract for a fixed term. It does not require the parties to continue performance for any period of time, and the employee can quit or be terminated at any time and for any reason. *Id.* at 48. Furthermore, the employer in an at-will relationship is permitted to alter the terms of the agreement—change the policies governing its employees—at any time, provided that the employer does so on a *prospective* basis. When the employer changes its policies prospectively, the employee must then accept this "offer"—the changed terms of employment—by continuing to work for the employer under the new terms. *Id.* at 48-49. The employee's continued work constitutes valuable consideration that renders the agreement enforceable. *Id.* Thus, an employee who is terminated is entitled to compensation for benefits that are accrued under the terms of the at-will agreement, and the at-will employer may not retroactively deprive the employee of agreed-to benefits. *Id.* at 49.

Here, Selex promised to provide severance pay to eligible full-time employees "whose employment terminate[d] due to lack of work, elimination of position, or change of control." Employee Handbook at 51. Under the handbook, employees are not eligible for severance when (1) the "employee voluntarily terminates employment"; (2) the "Company terminates employment for Cause"; or (3) the "Company terminates

9

employment due to retirement or death." *Id.* Under the separate policy schedule for senior management, Selex stated that department managers with more than ten years of service at the company would be entitled to nine months of severance pay. *See* Separation Policy.

In arguing that an agreement did not exist, defendants make much of the fact that the employee handbook included an explicit disclaimer that the "[p]olicies set forth in this handbook are not intended to create a contract, nor are they to be construed to constitute contractual obligations of any kind or a contract of employment between the employer and any of its employees" and stated that the provisions "may be amended or canceled at any time." Employee Handbook at 5. Although this is certainly evidence that an enforceable agreement did not exist, it is not dispositive, because D.C. law states that a contractual disclaimer will not always be sufficient to relieve an employer of obligations that it includes in its employee regulations. For example, in *Strass v. Kaiser Found. Health Plan of Mid-Atlantic*, 744 A.2d 1000 (D.C. 2000), the D.C. Court of Appeals held that a personnel policy manual that included an explicit disclaimer similar to the one here, but that also included language using mandatory terms for the conditions of employment (such as vacation, severance pay, and health and safety conditions) created a genuine factual question about whether the employer intended to be bound by the terms of the policy document. *Id.* at 1012-14.

Here, the Selex employee handbook includes numerous clauses purporting to include mandatory conditions or promises to its employees. First and foremost, the separation pay provisions are themselves phrased as though they are mandatory. *See, e.g.*, Employee Handbook at 5 ("All eligible non-senior management personnel will receive

10

Severance Pay . . . ."). Furthermore, the handbook's provisions on vacation, sick leave, holidays, and bereavement are also stated in mandatory terms indicating that the company intended to be bound by the promises it made in the manual. *Id.* at 34 ("Employees . . . <u>are eligible</u> to earn and use vacation time . . . .") (emphasis added); *id.* at 35 ("Employees with 200 or more hours of accrued vacation <u>are entitled</u> to annually sell back forty (40) hours . . . to the company . . . .") (emphasis added); *id.* at 36 (Selex "<u>will</u> grant 12 paid holidays per year.") (emphasis added); *id.* at 40 ("[B]ereavement leave <u>will</u> be provided . . . .") (emphasis added). Based on this language, I find that, under governing D.C. law, the company intended to be bound by its promises to the employees that it made in the handbook, and thus that Peck has the right to enforce the agreement for any benefits that he accrued under its terms.

The analysis does not end here, however, because a plaintiff bringing a breach of contract claim bears the burden of showing not only that a contract exists, but also that the elements of breach exist. *Banze v. Am. Int'l Exps., Inc.*, 454 A.2d 816, 817 (D.C. 1983). As a result, Peck must show that Selex breached its agreement to provide him severance pay. That means that Peck must show that he was entitled to severance under the agreement, <u>and</u> that he was not otherwise excluded from severance payment.

In order to be eligible for severance, Peck's employment must have terminated "due to lack of work, elimination of position, or change of control." Employee Handbook at 51. The parties have not asserted, nor is there any evidence, that Peck was fired because there was a lack of work or a change in the company's control. As a result, Peck must show that he was terminated because his position as Vice President of Business Development was

11

eliminated. Unfortunately for Peck, he has not met that burden. The evidence clearly shows that Peck was terminated because he would not return to Kansas to serve in a different capacity, not because Selex was eliminating the marketing position in D.C. In fact, the evidence shows that the position remained open and budgeted, and was ultimately filled in 2014. As such, he is not eligible for severance pay, and Selex is entitled to judgment on Count I of the Amended Complaint. Because Peck has not established his threshold eligibility for severance pay, the Court need not determine at this stage whether his refusal to accept a new assignment in Kansas constitutes "cause" for termination.

**B.     Count III of the Amended Complaint–Contract Claim for Relocation Expenses**

Peck also alleges that he is entitled to the $25,195 closing commission he paid for the sale of his Overland Park home. As discussed above, Peck formally entered into a relocation agreement with Selex in February 2012. Under that agreement, Selex agreed to compensate Peck for specific costs that he had incurred in his move from Overland Park to D.C., including "the costs associated with the sale of [his] primary residence in Overland Park." Relocation Agreement at 1. The agreement stated that, "[a]s a condition to receiving relocation benefits, you must remain employed by SELEX for at least two (2) years." *Id.* at 2. It also stated that if Peck "voluntarily" left Selex within one year of relocation, he would have to repay 100% of all relocation expenses, and if he left between the first and second year, he would have to repay 50% of all relocation expenses. *Id.*

Defendants argue that the contract's two-year clause was an express condition precedent to Peck's receiving relocation benefits under the contract, and that his failure to remain at the company for two years means that Selex was not obligated to provide him

12

with any relocation benefits whatsoever. But the text, the stated purpose of the agreement, and the parties' conduct under the agreement belie this interpretation. The contract's repayment clause only required Peck to repay Selex if he "voluntarily" left employment prior to two years, which he did not. Furthermore, the stated purpose of the agreement is to facilitate Peck's relocation to Washington, D.C. in 2012, not two years later in 2014. Selex's interpretation also conflicts with its own conduct under the agreement, namely, Selex's payment of other costs to Peck under the agreement as they were incurred in 2012. And lastly, even if the clause were a condition precedent as Selex asserts, a party that prevents a condition precedent from occurring—by firing an employee, for example— cannot stand on the condition's non-occurrence to avoid obligations under a contract. *See Reiman v. Int'l Hospitality Grp.*, 558 A.2d 1128, 1132 (D.C. 1989); *see also Swaback v. Am. Info. Techs. Corp.*, 103 F.3d 535, 542 n.16 (7th Cir. 1996). Peck, therefore, is entitled to judgment on Count III. Furthermore, I conclude that Peck is entitled to prejudgment interest at a 6% per annum rate, *see* D.C. Code § 15-109; *Fed. Mktg. Co. v. Va. Impression Prods. Co.*, 823 A.2d 513, 531-32 (D.C. 2003), and will permit the parties to submit a joint judgment order containing the prejudgment interest amount or simultaneously file memoranda addressing any dispute regarding the computation of prejudgment interest.

### IV. PLAINTIFF'S MOTION FOR RECONSIDERATION

Thus far, the discussion has focused solely on Counts I and III of the Amended Complaint, which where the subject of the June 2017 bench trial. However, Count II of the Amended Complaint alleged that Peck was entitled to $57,020 in deferred

13

compensation under ERISA. *See* Am. Compl. at 6-9. As noted above, I granted partial summary judgment to defendants and dismissed Count II with prejudice in March 2016. *See* 03/24/16 Mem. Op. and Order. In my opinion granting partial summary judgment, I held that the Key Employee Deferred Compensation Plan's Administrative Committee reasonably construed and applied the Plan when it determined that Peck had been terminated for cause and thus denied his April 2013 claim for benefits. *See* 03/24/16 Mem. Op. at 9-12. After the conclusion of the June 2017 bench trial, plaintiff moved under Federal Rule of Civil Procedure 54(b) and asked this Court to reconsider the March 2016 Order and grant judgment to Peck on the Count II ERISA claim. For the reasons discussed below, I must DENY that Motion.

Federal Rule 54(b) states that an interlocutory order "may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." Pursuant to Rule 54(b), the Court can revise an interlocutory order "as justice requires." *Capitol Sprinkler Inspection, Inc. v. Guest Servs., Inc.*, 630 F.3d 217, 227 (D.C. Cir. 2011). However, the moving party has the burden of showing that reconsideration is warranted, and that some harm or injustice would result if reconsideration were to be denied. *Pueschel v. Nat'l Air Traffic Controllers' Ass'n*, 606 F. Supp. 2d 82, 85 (D.D.C. 2009). Under that standard, reconsideration may be warranted "where there was a patent misunderstanding of the parties, where a decision was made that exceeded the issues presented, where a court failed to consider controlling law, or where a significant change in the law occurred after the decision was rendered." *Id.* (citing *Singh v. George Wash. Univ.*, 383 F. Supp. 2d 99, 101 (D.D.C. 2005)). Courts considering motions for

reconsideration should take into account, however, that "where litigants have once battled for the court's decision, they should neither be required, nor without good reason permitted, to battle for it again." *Singh*, 383 F. Supp. 2d at 101.

Here, plaintiff has not met the burden required of showing that reconsideration is warranted. Plaintiff's motion for reconsideration is largely a repetition of the arguments raised in his original motion for summary judgment, *see* Pl.'s Mot. Summ. J. [Dkt. # 42], and it provides no reason that persuades me to amend my earlier judgment that the Administrative Committee reasonably construed and applied the deferred compensation Plan when it determined that his termination had been for cause. *See* 03/24/16 Mem. Op. at 9-12; *cf. Capitol Sprinkler Inspection, Inc.*, 630 F.3d at 227 (denial of reconsideration proper when movant "raised no arguments for reconsideration the court had not already rejected on the merits"). As a result, plaintiff's Motion for Reconsideration is DENIED.

## CONCLUSION

For all of the reasons discussed in this Memorandum Opinion, the Court will enter judgment for Selex on Count I of the Amended Complaint, will enter judgment for Peck on Count III of the Amended Complaint, and will DENY Peck's Motion for Reconsideration of Count II of the Amended Complaint [Dkt. # 65]. An Order consistent with this Memorandum Opinion will issue separately.

*[signature]*
RICHARD J. LEON
United States District Judge